HENRY HORNBLOWER & others *vs.* EDWIN H. ABBOT.

Suffolk.    March 10, 1925. — May 20, 1925.

Present: RUGG, C.J., CROSBY, CARROLL, WAIT, & SANDERSON, JJ.

*Stockbroker.   Agency*, Scope of authority.   *Contract*, Construction, Performance and breach, Rescission.

The owner of five hundred shares of corporate stock which he had pledged with a bank employed a stockbroker to sell it for him, authorizing him to sell five hundred shares "or any part thereof, at the best price obtainable after caring for your compensation, not less, however, than 130 net to me.   As sales are made, the stock will be delivered to you by the [bank], whom I have advised of my order to you and who will make delivery in 50 share lots upon payment to them of the sale price." The stockbroker sold two hundred and seventeen shares on a January 24 and the remainder on January 25.   It then was discovered that the subscription transfer books closed on January 24; which fact was unknown to the parties when the order was placed and the sales were made. The certificates were in one hundred share lots and some were not properly indorsed.   The owner was ready and willing to give any powers of attorney, or make any indorsements requested of him. On January 27, the directors of the corporation declared a regular and an extra dividend payable February 15.   On January 31, the stockbroker paid the bank for three hundred shares.   On February 2, the owner made demand upon the stockbroker for the balance due on the sale of the remaining shares.   The stockbroker refused payment until he could get his money on February 25 and claimed dividends as on a sale completed January 27.   On February 4, the owner rescinded the agreement as to the two hundred shares.   On February 29, after the transfer books of the corporation were reopened, the stockbroker bought two hundred shares on the market to complete sales made by him and brought an action against the owner for the difference between the price on January 25 and that on February 29.   *Held*, that

(1) The agreement between the stockbroker and the defendant was definite and free from ambiguity;

(2) The stockbroker had no right to demand delivery until he paid the owner the agreed purchase price;

(3) The defendant was entitled to insist on payment to the bank directly after the sales were made, as a condition precedent to the delivery of the certificates by the bank;

(4) The refusal to take up and pay for the two hundred shares until after February 25 was a breach of the stockbroker's agreement and justified the plaintiff in rescinding the contract as to the two hundred shares;

(5) The fact that the stockbroker did not know as to the impending closing of the corporate transfer books did not excuse him;

(6) The fact that, because the certificates were in one hundred share lots, some of them had to be split up, did not affect the stockbroker's obligation to perform, since the parties agreed that it was the practice of the transfer agent and of the registrar of the stock to split certificates and reissue them in the same name even while the books were closed;

(7) The rule of law that ordinarily a principal by a termination of the relationship of agency cannot defeat an agent's right to indemnity for liabilities incurred in acting for his principal within the scope of his authority, and that the agent, although the agency has been terminated, may recover for liabilities incurred while acting as agent, was not applicable to the circumstances above described, since the plaintiff was justified in revoking his contract because of a previous breach by the stockbroker;

(8) The owner's right to rescind as to the two hundred shares was not dependent upon his first placing the stockbroker *in statu quo,* the owner having received no benefits and having nothing to return.

CONTRACT for damages resulting to the plaintiffs, doing business as Hornblower and Weeks, from alleged breach by the defendant of an agreement to transfer stock sold by the plaintiffs as stockbrokers for the defendant. Writ dated April 21, 1916.

The facts were agreed upon. Material facts are described in the opinion. In the Superior Court, the action came on to be heard by *Macleod,* J., who, under G. L. c. 231, § 111, without making a decision, reported it to this court for determination.

*L. Withington,* for the plaintiffs.

*R. G. Dodge,* (*E. H. Abbot, Jr.,* with him,) for the defendant.

CROSBY, J. This is an action of contract arising out of a written agreement for the sale of stock. At the request of the parties the judge of the Superior Court reported the case to this court upon an agreement as to all the material facts, without decision thereon, under G. L. c. 231, § 111.

The plaintiffs are stockbrokers having offices in Boston, Providence, Chicago, and certain other cities. The defendant, a resident of Cambridge in this Commonwealth, on January 22, 1916, called at the plaintiffs' Chicago office and after talking with one Child, a representative of the plaintiffs, entered into a written contract with them by which they were authorized to sell for him five hundred shares of stock of the By-Products Coke Corporation, for which the plaintiffs were to be paid a commission of $1 a

share on all sales. The stock at that time was pledged as collateral to the Rhode Island Hospital Trust Company of Providence, Rhode Island, for a loan. The stock was not listed upon any exchange. As a result of the conversation, Child dictated for the defendant's signature the following letter of instructions:

"January 22, 1916.

Messrs. Hornblower & Weeks,
          Chicago, Ill.
Gentlemen:—

I hereby authorize you to sell 500 shares of By-Products Coke Corporation stock, or any part thereof, at the best price obtainable after caring for your compensation, not less, however, than 130 net to me.

As sales are made, the stock will be delivered to you by the Rhode Island Hospital Trust Company of Providence, R. I., H. J. Wells, Esq., President, whom I have advised of my order to you and who will make delivery in 50 share lots upon payment to them of the sale price.

Yours truly,

14 Beacon Street,
P. O. Box 1151,
Boston, Mass."

"Upon reading over the letter, the defendant stated that he was not certain whether the certificates were in 50 or 100 share lots, and the words 'or 100' were inserted by him or at his direction, after the word '50,' and he then signed the letter."

In addition to the instructions contained in the letter, the defendant requested the plaintiffs to arrange for the transfer of two of the shares into the name of his cousin, Frederic V. Abbot. He then dictated to Child's stenographer a letter which was mailed, and which, so far as material, is as follows:

"Chicago, January 22, 1916.

H. J. Wells, Esq.,
          President, Rhode Island Hospital Trust Co.,
                    Providence, R. I.
My dear Sir:
Since writing you this morning I have arranged with

Messrs. Hornblower & Weeks, 37 South La Salle Street, Chicago, to sell for my account the 500 shares of By-Products Coke Corporation stock, or any part thereof, at the best price obtainable, not less, however, than 130 net to me.

I have informed them that as sales are made the certificates will be delivered to them upon payment by them of the sales price, which they will certify to you. They will take delivery in 50 or 100 shares certificates, if they make partial sales, and I request that you will pass to my credit on my loan from you the amounts so received from time to time from them, and shall be obliged to your courtesy for notifying me at my Boston address, 14 Beacon Street, Boston, Mass., P. O. Box 1151. . . .

Yours respectfully,<br>
Edwin H. Abbot."

Thereafter on January 24, 1916, the plaintiffs made sales of two hundred and seventeen shares, and on January 25, 1916, wrote the defendant that they had sold the remainder after reserving two shares as directed by the defendant to be transferred in the name of Frederic V. Abbot. At the close of business hours on January 24, the transfer books of the corporation closed, so to remain until February 25, 1916. This fact was unknown to the plaintiffs and to the defendant at the time the sales were made. The transfer agent of the corporation was the Bankers Trust Company of New York City. On January 27, a representative of the Providence office of the plaintiffs learned from the trust company that the stock was in five certificates of one hundred shares each, four of which were not indorsed by the defendant and were without powers of attorney attached, except that one power of attorney to transfer four hundred shares was filled out in the name of the trust company and was attached. The plaintiffs declined to take and pay for the certificates in that condition, but thereafter on January 31, 1916, the trust company procured from the defendant a separate power of attorney for the transfer of each one hundred shares and on the same day the plaintiffs took up certificates for three hundred shares, paying the bank $39,500. On January 27,

1916, the directors of the corporation declared a dividend of $1.50 per share and an extra dividend of $1 per share, payable February 15 to stockholders of record on January 27. These dividends were in due course paid to the defendant. Thereafter the defendant paid the plaintiffs the dividends received by him on the three hundred shares sold by them. No explanation was given to the trust company by the plaintiffs for their failure to take up and pay for the remaining two hundred shares.

On February 2, 1916, the defendant wrote the plaintiffs that they owed him on January 26, a balance of $26,307.50. He urged them to take up and pay for the two hundred shares, and pointed out the loss of interest which he was incurring by reason of their delay in paying the balance due. On the same day the plaintiffs wrote the defendant, in substance, that as the stock was sold in odd lots, it could not be delivered until the certificates were split up and that this could not have been done before the books closed. The letter stated: "You will understand that we would not be able to get our money for the remaining 200 shares until after February 25th when the stock can be gotten in shape to make delivery. We acted merely as brokers in this transaction and feel that we are not responsible for this delay, as we had no way of knowing that the company was about to close their transfer books."

On February 4, 1916, the defendant wrote the plaintiffs in substance that, since they had declined to take up and pay for the two hundred shares as agreed, he rescinded the contract as to those shares with the exception of the two which were to be transferred to Frederic V. Abbot and for which he enclosed a check for $260.04. On February 9 and 17, 1916, the plaintiffs reasserted their refusal to take and pay for the two hundred shares until February 25, but claimed all dividends as upon a completed sale on January 27. It appears that of the shares sold on January 25, some of them were sold to themselves.

On February 29, 1916, after the books of the corporation were opened, the plaintiffs bought in the market for delivery to their customers two hundred shares, and in this action seek

to hold the defendant liable in damages for the difference between the price at which they sold on January 24 and January 25, and the price which they paid on February 29. It also appears that on February 29, when they bought the two hundred shares for their customers, they bought forty-six shares from themselves.

The rights and obligations of the parties are to be determined by the proper construction of the letter of January 22, 1916, under which the plaintiffs were authorized to sell the stock as the defendant's agents. Its language is definite and free from ambiguity. By its terms, when sales were made the stock was to be delivered to the plaintiffs by the trust company on the defendant's order, and the company was to make delivery in fifty or one hundred share lots, "upon payment to . . . [it] of the sale price." Under this agreement the plaintiffs had no right to demand or receive delivery of the certificates unless and until they paid the price for which the stock was sold. The authority vested in the plaintiffs was special and limited in its extent, and could not be exercised outside the terms of the special authority conferred upon them. *Parsons* v. *Martin*, 11 Gray, 111. *Stollenwerck* v. *Thacher*, 115 Mass. 224, 227.

The authority to sell at the best price obtainable, but for not less than "130 net," was an authority to sell for cash, for immediate delivery, and cannot properly be construed as a sale for future delivery. *Parsons* v. *Martin, supra. Adams* v. *Dick*, 226 Mass. 46, 55. The letters to the defendant notifying him of the sales show that the plaintiffs understood they were for present delivery. All the stock having been sold on January 24 and 25, the plaintiffs were not authorized to sell for a price to be paid after February 25, or at a date after the books were reopened. Such would be contrary to the defendant's instructions. As the only sales the plaintiffs were authorized to make were for present delivery, they were bound, whenever the stock was sold, to pay the trust company the amounts realized at once, procure the certificates from the trust company and split them, if necessary, and make deliveries to the purchaser. They could not sell for cash to be paid on January 25 and 26 and then

postpone payment for a month, as they claimed the right to do; that was not in accordance with their contract but manifestly was in violation of their instructions.

By the express terms of the letter of January 22, the defendant was not required to deliver the certificates to the plaintiffs upon being notified of sales. The plaintiffs were obliged to procure the certificates from the trust company upon payment to it of the sales price, and take them in fifty or one hundred share lots. The defendant was entitled to insist on payment to the trust company directly after the sales were made, as a condition precedent to the delivery of the certificates by the company. That such was their construction of the letter of January 22 is obvious from their letter to the defendant dated January 24, and from their letter of the same date to the trust company.

If the plaintiffs desired to protect themselves from liability to their customers in carrying out their agreement with the defendant, they could readily have done so by making sales on condition that the purchasers should advance the purchase price to take up the certificates and await delivery until the certificates were split and transferred, if that were necessary; or the plaintiffs could have advanced the money to the trust company. The original contract of January 22 was never changed or modified in any respect and the plaintiffs remained bound by its terms. *Tobin* v. *Larkin,* 183 Mass. 389. *Trevas & Schack, Inc.* v. *Napel Mills Co.* 241 Mass. 452. If they did not know the amount of shares represented by each certificate, they could easily have learned that fact by inquiry of the trust company.

The plaintiffs' refusal, after demand made by the defendant on February 2, to take up and pay for the two hundred shares, sold on January 24 and 25, until after February 25 when the transfer books should be opened, was a breach of the plaintiffs' agreement and justified the defendant in rescinding the contract as to the two hundred shares. The contention of the plaintiffs that they were excused from delivery and payment for the stock until after February 25 because they did not know when the books could close cannot be sustained; that was a matter which, in the

exercise of reasonable prudence and diligence they could have ascertained from the agents to whom they would be required to present the certificates for transfer when the stock was sold, and did not justify them in violating their contract with the defendant. If they were mistaken as to the date when the books closed, that was not the fault of the defendant. They were not excused from carrying out their agreement, which was absolute in its terms. *Taylor* v. *Finnigan,* 189 Mass. 568. *McDonough* v. *Almy,* 218 Mass. 409. *Gaston* v. *Gordon,* 208 Mass. 265. *Imbeschied* v. *Lerner,* 241 Mass. 199. Nor did the fact that some of the stock had to be split up affect their obligation to carry out the contract. The representation of the defendant that the stock was in fifty or one hundred share lots was strictly true. The closing of the transfer books of the corporation from January 24 to February 25 did not prevent a delivery of the stock to purchasers until after February 25, as it is agreed it was the practice of the transfer agent, and of the registrar of the stock, to split certificates, and reissue them in the same name, even while the books were closed. If the plaintiffs as brokers were not aware of this practice, they could have ascertained it by the exercise of reasonable and proper diligence. *Greenfield Savings Bank* v. *Simons,* 133 Mass. 415, 416.

It is agreed that, when the transfer books of a corporation are closed, the delivery by a seller to a buyer of a certificate duly indorsed for the exact number of shares sold or accompanied by power of attorney is a good delivery. Therefore the plaintiffs could have taken up the two remaining certificates of one hundred shares each, presented them to the transfer agent and had them split into certificates for the required amounts, in the plaintiffs' name, and delivered them duly indorsed or with power of attorney. The agreed facts show that the defendant was ready and willing to give any powers of attorney, or make any indorsements requested of him. The responsibility for splitting the certificates into the amounts sold to customers rested upon the brokers and not upon the defendant.

The plaintiffs having notified the defendant, by letters

dated January 24 and 25, that they had sold the five hundred shares, and having telegraphed the trust company, under date of January 27, of their intention to take them up, it was then their duty forthwith to account for all such sales. The agreed facts show that the plaintiffs refused to carry out the terms of the agreement. As the breach was serious and affected the substantial rights of the defendant, he was justified in rescinding the contract so far as it related to the two hundred shares. *National Machine & Tool Co.* v. *Standard Shoe Machinery Co.* 181 Mass. 275. *Dudley* v. *Wye,* 230 Mass. 350.

Ordinarily a principal cannot defeat an agent's right to indemnity, for liabilities incurred in acting for his principal within the scope of his authority, by a termination of the relationship, and the agent may, although the agency has been terminated, recover for liabilities incurred while acting as agent. *Baker* v. *Angell,* 46 Hun, 679. *Blackstone* v. *Buttermore,* 53 Penn. St. 266. 1 Mechem on Agency, § 564. See also cases collected 21 R. C. L. 834–5. This principle, however, is not applicable to a case like the present where the defendant was justified in revoking his contract because of a previous breach by the plaintiffs. In these circumstances the defendant cannot be held liable for loss to the plaintiffs resulting from their refusal to act within the scope of their authority. In the cases cited by the plaintiffs in this connection, there was no failure on the part of the agent to act within the scope of his authority. The right of an agent to reimbursement when he fails fully to complete his undertaking depends upon the nature of the undertaking and the reason for his failure. Mechem on Agency, § 2481.

If the plaintiffs had performed their part of the contract by paying for and taking up and delivering the stock, no loss would have occurred. As their refusal to do so resulted in the loss, it must be borne by them; they can have no claim for indemnity against the defendant.

The suggestion of the plaintiffs that the defendant could not rescind because they could not be placed *in statu quo* is without merit; the cases cited to support this proposition involve breach of warranty, fraud, and like cases where the

rescinding party has received benefits which he cannot return. In the case at bar the defendant has received no benefits and there is nothing for him to return.

In view of the conclusion reached, it is unnecessary to consider whether as a condition precedent to recovery the plaintiffs were required to tender the price for which the stock was to be sold. No tender in fact was made by them. See *Breed* v. *Hurd,* 6 Pick. 356. *Folsom* v. *Barrett,* 180 Mass. 439. *Eddy* v. *Davis,* 116 N. Y. 247.

*Judgment for the defendant.*